618 A.2d 233

**MERCEDES–BENZ OF NORTH AMERICA, INC., et al.**

v.

**Herbert S. GARTEN.**

**No. 475, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

Jan. 11, 1993.

548

Paul Walter (William C. Sammons, Joan F. Brault, Melissa C. Giove and Tydings & Rosenberg, on the brief), Baltimore, for appellant Mercedes–Benz.

Lynne B. Malone (Deborah J. Clarke and Anderson, Coe & King, on the brief), Baltimore, for appellant Valley Motors, Inc.

Howard J. Schulman, Baltimore, for appellee.

Argued before ALPERT, FISCHER and HARRELL, JJ.

HARRELL, Judge.

Appellee, Herbert S. Garten, filed suit against Mercedes–Benz of North America, Inc. (MBNA) and Valley Motors, Inc., appellants, alleging: (1) breach of express warranty; (2) breach of implied warranty; (3) violation of the Unfair or Deceptive Trade Practices provisions of the Consumer Protection Act (CPA), Md.Com.Law II Code Ann. § 13–301 *et seq.* (1990 & Supp.1992); and, (4) violation of the Automotive Warranty Enforcement Act, Md.Com.Law II Code Ann. § 14–1501 *et seq.*, in connection with his purchase of a new 1990 Mercedes–Benz, Model 300E. A two day bench trial in the Circuit Court for Baltimore County (Murphy, J.) was held in August 1991. At the close of evidence, the trial court, in an oral opinion, ruled in Mr. Garten's favor on all four counts. After a hearing on 20 September 1991, the

trial court also granted Mr. Garten's petition for attorney's fees. Judgment was entered on 24 September 1991. This appeal followed.

*Facts*

In April 1990, Mr. Garten sought to purchase a new 1990 Mercedes–Benz, Model 300E from Valley Motors. He spoke to a Valley Motors salesman, Mr. Robert Bell, with whom he had dealt previously, about trading in his present car, a 1986 Mercedes–Benz, Model 300E.[1] Mr. Bell told Mr. Garten that he would have to bring his 1986 Mercedes–Benz in to Valley Motors in order to determine its trade-in value. Mr. Garten testified that during this conversation Mr. Bell represented to him that, except for some cosmetic changes, the 1990 300E was "identical" to the 1986 300E.

On 9 April 1990, Mr. Garten brought his 1986 300E into Valley Motors to be appraised. Mr. Garten testified that during this visit to Valley Motors he asked Mr. Bell to describe the exact differences between the 1986 and 1990 models, and again Mr. Bell replied that they were only cosmetic. After the appraisal was completed Mr. Garten left Valley Motors. Shortly thereafter, Mr. Bell called Mr. Garten on his car phone and they agreed on a purchase price of approximately $42,500[2] with a $17,500 trade-in allowance for the 1986 300E. Mr. Garten took delivery of the 1990 300E on 10 April 1990.

The following morning, upon starting the 1990 300E for the first time that day, Mr. Garten found that the car had difficulty shifting from second to third gear for a short period of time until the car warmed up. Mr. Garten telephoned Mr. Bell to complain about the new car and what he considered to be a possible transmission problem. Mr.

---

**1.** The 1986 300E that Mr. Garten owned and the 1990 300E that he sought to purchase have automatic transmissions.

**2.** In their briefs, appellants and appellees give differing figures as to the purchase price of the 1990 300E. We rely on the figures given by Mr. Garten during his testimony.

Garten agreed to wait until the 1000 mile servicing to see if the problem worked itself out.

On 3 May 1990, Mr. Garten brought the 1990 300E to Valley Motors for the 1000 mile checkup and presented a memorandum describing the problems he was having with the car, focusing on the automobile's delayed upshift from second to third gear. The report from the service department personnel stated that they were unable to duplicate the problems about which Mr. Garten complained and that the transmission upshift delay, which Mr. Garten considered to be a problem, was its normal operation.

In the ensuing few days Mr. Garten spoke to several people from MBNA and Valley Motors, the end result being that there was no remedy to the delayed upshift, which was caused by an emissions control device and was, in fact, the way the 1990 300E was designed to operate.[3] Mr. Garten was not satisfied with this response and on 9 May 1990 he returned the 1990 300E to Valley Motors. On the same day, Mr. Garten delivered two letters[4] to Valley Motors stating that the 1990 300E was defective and that he was revoking his acceptance and rescinding the sale. Mr. Garten left the keys to the 1990 300E, requested the return of his 1986 300E, and asked Valley Motors how they could re-transfer titles to the two cars. Finally, Mr. Garten informed Valley Motors that he would be renting a car until this matter was resolved. The 1990 300E had approximately 1800 miles on it the day Mr. Garten left it with Valley Motors.

---

**3.** The delayed upshift was the result of an emissions control system designed to bring the catalytic converter quickly to operating temperature from a cold start. After a sufficient engine temperature was reached—depending upon the temperature of the car when it was started it could take up to ninety seconds—the 1990 300E would shift normally.

**4.** Mr. Garten hand delivered the first letter and sent the second by certified mail. Both letters addressed his dissatisfaction with the 1990 300E and his wish to rescind the sale.

The 1990 300E sat parked in Valley Motors' lot for approximately seven months until December 1990 when Mr. Garten retrieved the car. He subsequently traded in the 1990 300E for a new 1991 300E that he purchased from another Mercedes–Benz dealer. The total purchase price of the 1991 300E was $43,123.50. Mr. Garten also traded in the 1990 300E for $31,500.

We will include additional facts as necessary in our discussion of the issues presented.

### Issues

MBNA and Valley Motors each attack the four counts upon which Mr. Garten was able to recover in the trial court. For the sake of clarity, we will address the issues by count as filed in Mr. Garten's complaint and then turn to the parties' arguments on damages and attorney's fees. Where the appellants' arguments on the counts are similar or the same, we will address their arguments together. Where their arguments and theories differ, we will discuss their positions separately.

MBNA raises the following issues, which we have slightly rephrased:

I. Whether the trial court erred in finding MBNA liable for breach of an express warranty under Md.Com.Law I § 2–313 Code Ann. (1992) and for violation of the Unfair or Deceptive Trade Practices provisions of the CPA, Md. Com.Law II § 13–301 et seq. Code Ann. (1990 & Supp. 1992) [5];

A. Whether the trial court erred in finding that the Valley Motors salesman who made the statements to Mr. Garten concerning the 1990 300E was MBNA's agent;

B. Whether the trial court erred in finding that the delayed upshift device installed in the 1990 300E consti-

---

**5.** Mr. Garten did not refer to the code sections in his complaint for the breaches of express and implied warranty counts, but the parties refer to the Commercial Law Article in their briefs; therefore, we do the same in our discussion of these issues.

tuted a material change from the 1986 300E, thereby making Mr. Bell's representations false;

II. Whether the trial court erred in finding that the 1990 300E was unmerchantable under Md.Com.Law I Code Ann. § 2–314 and substantially impaired under the Automotive Warranty Enforcement Act, Md.Com.Law II Code Ann. 14–501 *et seq.;*

III. Whether the trial court erred in its calculation of damages;

A. Under Mr. Garten's theories of implied and express warranty and unfair or deceptive trade practices, whether there was sufficient evidence to establish that Mr. Garten sustained any injury as a result of the delayed upshift device;

B. Whether the trial court erred in allowing Mr. Garten to recover damages under the Automotive Warranty Enforcement Act, § 14–501 *et seq.,* because he disposed of the 1990 300E; and

IV. Whether the trial court erred in its award of attorney's fees because Mr. Garten did not identify the number of hours spent on the Unfair or Deceptive Trade Practices and Automotive Warranty Enforcement Act counts, the only counts that allow recovery of attorney's fees.

Valley Motors presents the following issues for our review, which we have slightly recast:

I. Whether the trial court erred in finding a breach of an express warranty;

II. Whether the trial court erred in holding Valley Motors liable under the Unfair and Deceptive Trade Practices provisions;

III. Whether the trial court erred in holding Valley Motors, a car dealer, liable under the Automotive Warranty Enforcement Act;

IV. Whether the trial court erred in finding that the installation of the delayed upshift device substantially

impaired the value of the 1990 300E under the Automotive Warranty Enforcement Act;

V. Whether the trial court erred in finding that the 1990 300E was unmerchantable under Md.Com.Law I Code Ann. § 2–314;

VI. Whether the trial court erred in awarding attorney's fees or, in the alternative, whether the amount awarded was erroneous; and

VII. Whether the trial court's award of damages was erroneous.

## Standard of Review

On appeal, we review the case on both the law and the evidence. Md.Rule 8–131(c). We will not set aside the trial court's judgment on the evidence unless clearly erroneous. Accordingly, in reviewing the lower court's findings, our function is not to determine whether we might have reached a different conclusion. Rather, it is to decide only whether there was sufficient evidence to support the trial court's findings. In making this decision, we must assume the truth of all the evidence, and of all the favorable inferences fairly deducible therefrom, tending to support the factual conclusions of the lower court. *Pahanish v. W. Trails, Inc.,* 69 Md.App. 342, 353–54, 517 A.2d 1122 (1986).

## Discussion

### Count I: Breach of Express Warranty

#### Was Mr. Bell MBNA's Agent?

MBNA argues that the trial court erred in finding it liable for breach of an express warranty. Specifically, MBNA claims that the trial court was clearly erroneous in finding that Mr. Bell, who made the representations to Mr. Garten, was an agent of MBNA and, therefore, could bind MBNA by his statements. We agree with MBNA's position and explain.

There are two possible agency relationships that could be found between Mr. Bell and MBNA. The first, actual

agency, is a fiduciary relationship "which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Proctor v. Holden*, 75 Md.App. 1, 20, 540 A.2d 133, *cert. denied*, 313 Md. 506, 545 A.2d 1343 (1988). This Court, in *Schear v. Motel Management Corp. of Am.*, 61 Md.App. 670, 487 A.2d 1240 (1985), set forth the characteristics of an actual agency relationship:

> There are three elements that are integral to an agency relationship: (1) The agent is subject to the principal's right of control; (2) the agent has a duty to act primarily for the benefit of the principal; and (3) the agent holds a power to alter the legal relations of the principal.

*Id.* at 687, 487 A.2d 1240. (Citation omitted).

■ The other possible agency relationship is that of apparent agency. In order to recover under an apparent agency theory, Mr. Garten must show that: (1) appearances created by MBNA misled him into believing that Mr. Bell was an employee of MBNA; (2) this belief was objectively reasonable under all the circumstances; and, (3) he relied upon this relationship in making his decision to purchase the 1990 300E. *See Chevron, U.S.A., Inc. v. Lesch*, 319 Md. 25, 34–35, 570 A.2d 840 (1990).

The trial court specifically found Mr. Bell to be an agent of MBNA, stating:

> Now, [MBNA] contends that this is not its problem, this is between Mr. Garten and Valley Motors.... I find that there was an agency relationship between the Defendants; that the dealer is an agent for purposes of the facts of this case.
>
> The *Chevron* case is, in my judgment, distinguishable.... *Chevron* doesn't apply here, that [MBNA] authorized Mr. Bell to make statements about the vehicles that were in that showroom on behalf of [MBNA], and the agency relationship is, in my judgment, resolved against [MBNA].

██ Our review of the record extract reveals the following: (1) Mr. Bell was hired by Valley Motors; (2) only Valley Motors could fire Mr. Bell; (3) MBNA exerted no control over Valley Motors with respect to the sales and promotion of the vehicles; (4) MBNA did not require Valley Motors to resell the vehicles at a particular price; (5) MBNA did not supervise Valley Motors' daily activities; (6) MBNA did not require Valley Motors employees to discuss certain characteristics of the automobiles with customers nor did it require the employees to withhold certain information; (7) Mr. Bell attended MBNA sponsored training seminars and test drive programs; (8) Mr. Bell read and relied upon MBNA publications for information about MBNA automobiles; (9) there was no evidence showing that Mr. Bell acted primarily for MBNA's benefit; and, (10) Valley Motors purchases automobiles from MBNA and then sells them for its own account. This evidence shows the clear error committed by the trial court in finding that Mr. Bell was an agent of MBNA. Not one element of an actual agency relationship can be found in the above listed evidence. Although Mr. Garten refers this Court to the MBNA sponsored seminars and test drive programs and the MBNA publications received by Valley Motors, we do not believe that attending these functions or receiving these materials is anything but the normal incidents of a franchise relationship.

In addition, we believe that the trial court erred by not applying *Chevron* to the present case. Under *Chevron*, it was not objectively reasonable under all the circumstances for Mr. Garten to believe that MBNA owned or operated Valley Motors, or that it so controlled the employees as to be considered their master and, therefore, responsible for their statements. *See Chevron*, 319 Md. at 34–44, 570 A.2d 840. We, therefore, hold that the trial court was erroneous in finding that Mr. Bell was an agent of MBNA. As a result, MBNA may not be held liable for breach of an express warranty.

### Did Valley Motors Create and then
### Breach an Express Warranty?

Valley Motors argues that the trial court erred in finding it liable for breach of an express warranty for three reasons: (1) the statement made by Mr. Bell to Mr. Garten was one of opinion and not of fact; (2) the statement made concerning the 1990 300E was true; and, (3) the trial court did not explicitly make a factual finding that the statement made by Mr. Bell was a warranty. We disagree with Valley Motors' contentions and explain.

Section 2–313 of the Commercial Law Article provides, in pertinent part:

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

An express warranty is breached "when a product fails to exhibit the properties, characteristics, or qualities specifically attributed to it by its warrantor, and therefore fails to conform to the warrantor's representations." *McCarty v. E.J. Korvette, Inc.*, 28 Md.App. 421, 437, 347 A.2d 253 (1975).

The trial court, in its oral opinion, stated:

Now, the question that [Mr. Garten] was asking and the question that Mr. Bell understood him to be asking was is this essentially the same automobile, will I get the same kind of performance out of this 1990 as I got out of the 1986 that I'm very satisfied with. Frankly, the answer should have been and the answer that Mr. Bell thereafter gave to his customers is that essentially it is the same vehicle, there is one little override feature here that takes effect for the first ninety seconds or so in the morning, and thereafter there is no problem with it.

So, Mr. Garten should have been told about that. He was entitled to that information and he relied upon a false representation of a material fact when he purchased the car.

* * * * * *

Let's face it, Mr. Garten asks is this the same car and will it do the same things my 1986 does. The answer was yes and the answer was false because of this emission control device, this up-shift device.

Mr. Garten testified that Mr. Bell, Valley Motors' salesman, represented to him that the 1990 300E was "identical" to the 1986 300E, except for cosmetic changes. In contrast, Mr. Bell testified that he represented the two cars to be essentially the same. By this he meant that overall they were the same in that the ride, appearance, horsepower rating, and size of the engine had not been changed. He was not, he claimed, speaking in technical terms to Mr. Garten.

■ Valley Motors first claims that the general nature of Mr. Bell's response conveys that it was an opinion of comparison. We agree that Mr. Garten asked Mr. Bell for a general comparison of the two vehicles, but Mr. Bell's response conveyed a certain amount of factual information. Therefore, we are not prepared to hold that the trial court was clearly erroneous in finding that Mr. Bell's representation was one of fact.

■ Valley Motors' second contention is that the statement was true. Our review of the record extract, however, focusing on Mr. Bell's and Mr. Garten's testimony and viewing the evidence in a light most favorable to Mr. Garten, leads us to conclude that the trial court was not clearly erroneous in finding that the statement was false, i.e., that the 1990 300E did not exhibit the qualities attributed to it by Mr. Bell.

■ Valley Motors' final argument is that the trial court did not make a factual finding that the statement made by

Mr. Bell was a warranty. This argument is clearly without merit. The trial judge specifically found for Mr. Garten and stated, "I'm finding against both Defendants under all counts." Count I, as plead by Mr. Garten, was for breach of an express warranty; therefore, by finding against the defendants under all counts, the trial court was implicitly finding the existence and breach of an express warranty. In addition, absent an indication to the contrary, a judge is presumed to apply the law correctly to the case before him or her. *Hebb v. State,* 31 Md.App. 493, 499, 356 A.2d 583 (1976). Valley Motors, therefore, has not convinced us that the trial court failed to find all the elements of an express warranty and its breach.

### Count II: Breach of Implied Warranty

*Did the trial Court Err in Finding*
*the 1990 300E Unmerchantable?*

MBNA and Valley Motors present the same arguments to support their positions that the 1990 300E was merchantable within the meaning of § 2–314 of the Commercial Law Article. In fact, in its brief, Valley Motors adopts MBNA's argument, pursuant to Md.Rule 8–503. Therefore, we address the parties' arguments under this count together.

Appellants argue that the trial court erred when it found that the delayed upshift device constituted a defect under § 2–314. They claim that the ordinary and intended purpose of a car is to provide reasonably safe transportation. Therefore, the 1990 300E, in order to satisfy the requirements of § 2–314, simply had to provide reasonably safe transportation, and the only evidence Mr. Garten put on at trial that the car was unsafe was that he was afraid he would be hit from behind as he was overtaken by faster cars traveling up a hill near his home.

Section 2–314 provides, in pertinent part:

(2) Goods to be merchantable must be at least such as

(a) Pass without objection in the trade under the contract description; and

\* \* \* \* \* \*

(c) Are fit for the ordinary purposes for which such goods are used.

■ In *Frericks v. Gen. Motors Corp.*, 274 Md. 288, 301, 336 A.2d 118 (1975), the Court of Appeals stated that the fitness for ordinary purposes "logically *includes*" a promise that reasonable safety measures have been provided for in case of collision. (Emphasis supplied). The warranty of fitness for the ordinary purpose simply means that the automobile is fit for reasonably safe transportation when it is used in its normal manner. *Myers v. Montgomery Ward & Co.*, 253 Md. 282, 295–96, 252 A.2d 855 (1969).

■ In the case *sub judice*, the 1990 300E was clearly fit for the ordinary purposes for which automobiles are used. There was no evidence, other than Mr. Garten's fear of being hit from behind by speeding cars, that the 1990 300E was unsafe in any way. In fact, Mr. Garten put approximately 1800 miles on the car from April to May in 1990. This is hardly indicative of an individual who considers a car unsafe. There was no evidence that the car ever failed to start or failed to transport Mr. Garten where he needed to go.

Mr. Garten claims that the device prevented the car from shifting from second to third gear. In reality, the device only delayed the automobile's shifting from second to third gear for a maximum of ninety seconds, and Mr. Garten discovered that the device could be overridden by pressing the accelerator at least three-fourths of the way to the floor. Mr. Garten erroneously relies upon *Champion Ford Sales, Inc. v. Levine*, 49 Md.App. 547, 433 A.2d 1218 (1981), to argue that the 1990 300E was substantially impaired. The *Levine* case dealt with the question of whether a party justifiably revoked acceptance of an automobile under § 2–608 of the Commercial Law Article and not whether the automobile was merchantable.

Finally, under § 2–314(2)(a), the automobile must "pass without objection in the trade under the contract description." The 1990 300E was made in the same way as all other 300Es that possessed the delayed upshift device and the car in question was accepted by another Mercedes–Benz dealer as a trade-in. There is simply no evidence that the car failed to meet the implied warranty requirements of § 2–314; therefore, we hold that the trial court was clearly erroneous in finding that the device constituted a defect.

### Count III: Violation of the Unfair or Deceptive Trade Practices Provisions of the Consumer Protection Act

*Did the Trial Court Err in Holding MBNA Liable for a Violation of the Consumer Protection Act?*

██ Because we hold that the trial court erred in finding that Mr. Bell was MBNA's agent, *see* discussion of Count I, *infra,* MBNA cannot be held liable under the CPA for Mr. Bell's statements.

*Did the Trial Court Err in Holding Valley Motors Liable Under the Consumer Protection Act?*

██ Valley Motors first argues that it did not violate the CPA because Mr. Bell did not make a false representation and/or fail to disclose a material fact which representation or failure had the capacity, tendency, or effect of deceiving or misleading consumers. Valley Motors also claims that the CPA only addresses unfair or deceptive *practices* and because Mr. Garten's situation is unique, it cannot be held liable under the CPA. We disagree and explain.

The CPA lists fifteen possible violations and provides, in pertinent part:

**§ 13–301. Unfair or deceptive trade practices defined.**
Unfair or deceptive trade practices include any:

(1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representa-

tion of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;

(2) Representation that:

(i) Consumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have;

\* \* \* \* \* \*

(3) Failure to state a material fact if the failure deceives or tends to deceive.

As discussed under Count I, *infra,* we hold that the trial court was not clearly erroneous in finding that Mr. Bell made a false statement of fact. We, therefore, hold that the trial court was not clearly erroneous in finding Valley Motors liable under any one of the above listed subsections. Our discussion of the evidence under Count I clearly supports a finding that Valley Motors represented that a consumer good, the 1990 300E, had a characteristic which it did not, in fact, possess.

 Appellant's second argument, that the statement in question does not rise to the level of a "practice," is also without merit. Valley Motors' definition of "practice" is not in accord with its context in the CPA and as applied by the Court of Appeals. *See Sonnenberg v. Security Management Corp.,* 325 Md. 117, 131, 599 A.2d 820 (1992); *Golt v. Phillips,* 308 Md. 1, 8-10, 517 A.2d 328 (1986). In conclusion, the trial court was not clearly erroneous in finding Valley Motors liable under the CPA.

### Count IV: Violation of the Automotive Warranty Enforcement Act

 Valley Motors argues that the trial court erred in holding it liable under the Automotive Warranty Enforcement Act (Lemon Law) because the Lemon Law only imposes liability upon the car manufacturer or factory branch and not the car dealer. Valley Motors and MBNA also make two similar arguments. First, they contend that the trial court erred in finding that the delayed upshift device sub-

stantially impaired the use and value of the 1990 300E, as required by § 14–1502(c) of the Lemon Law. Second, they argue that Mr. Garten could not avail himself of any relief under the Lemon Law because he disposed of the 1990 300E and did not return it to the manufacturer. We agree with appellants' final argument and explain.

Section 14–1502 of the Lemon Law provides, in pertinent part:

(c) *Uncorrectable defects.*—(1) If, during the warranty period, the manufacturer or factory branch, its agent, or its authorized dealer is unable to repair or correct any defect or condition that substantially impairs the use and market value of the motor vehicle to the consumer after a reasonable number of attempts, the manufacturer or factory branch, at the option of the consumer, shall:

(i) Replace the motor vehicle with a comparable motor vehicle acceptable to the customer; or

(ii) Accept *return of the motor vehicle from the consumer* and refund to the consumer the full purchase price.... (Emphasis supplied).

Mr. Garten clearly considered this "defect" uncorrectable, but did not avail himself of the remedy provided for under § 14–1502(c)(i) because by replacing the 1990 300E he would have been faced with exactly the same "problem." He had only one other remedy under the Lemon Law, to return the 1990 300E and obtain a refund of the full purchase price. Mr. Garten, however, disposed of the automobile when he traded it in to another Mercedes–Benz dealer and, as a result, waived the remedy available to him under § 14–1502(c)(ii). Therefore, the trial court erred in holding the appellants liable under the Lemon Law. Because our holding is dispositive of appellants' liability under the Lemon Law, we need not reach their remaining arguments on this issue.

### *Damages*

Because we hold that the trial court erred in finding MBNA liable under *any* of the counts and reverse the trial

court's ruling on MBNA's liability, we need not consider MBNA's arguments on damages.

Valley Motors seeks to attack every award of damages made by the trial court. Valley Motors first claims that Mr. Garten accepted the 1990 300E and, therefore, he is only entitled to recover the difference between the value of the goods as accepted and the value they would have had if they had been as warranted. *See* Md.Com.Law I Code Ann. § 2–714(2). Mr. Garten argues that he justifiably revoked acceptance of the car under § 2–608 of the Commercial Law Article and that his remedies are under §§ 2–711 and –712, which include the cost of cover[6] and incidental and consequential damages. Valley Motors also argues that Mr. Garten suffered no injury that is compensable under § 13–408 of the CPA because there was no evidence tending to show that the 1990 300E was diminished in value.

Under § 2–608, Mr. Garten could revoke acceptance if the nonconformity of the 1990 300E substantially impaired its value to him and if he reasonably believed the nonconformity would be cured and it was not seasonably cured, or if the nonconformity was difficult to discover. *See* Md.Com.Law I § 2–608(1)(a) Code Ann. (1992). In addition, revocation must occur within a reasonable time after Mr. Garten discovered the nonconformity.

Section 13–408(a) of the CPA permits "[a]ny person [to] bring an action to recover for injury or loss sustained by him as the result of a practice prohibited by this title." Mr. Garten may recover damages for his actual loss or injury caused by Valley Motors' violation of the CPA. This includes Mr. Garten's restitutionary and consequential damages. In addition, Mr. Garten may recover the costs of obtaining substitute transportation to the extent that it was reasonable and of similar quality. *See Golt,* 308 Md. at 13–14, 517 A.2d 328.

---

**6.** Under § 2–712 of the Commercial Law Article, Mr. Garten may "cover" by making a reasonable purchase of substitute goods, as long as the purchase is made in good faith and without unreasonable delay.

In the case *sub judice,* Mr. Garten received the car on 10 April 1990, and he experienced what he considered a problem (the delayed upshift) the very next morning. He contacted Mr. Bell to discuss the problem and agreed to wait until the 1000 mile checkup to see if the problem worked itself out. When it became apparent to Mr. Garten that the delayed upshift could not be changed or "repaired," he returned the car to Valley Motors on 9 May 1990 and sought to revoke his acceptance. Valley Motors, however, took the view that Mr. Garten simply abandoned his car in their lot and refused to accept his revocation. Finally, after approximately seven months, Mr. Garten retrieved the car in December 1990 and traded it in for a 1991 300E.

 Based on our reading of the record extract and the type of damages awarded by the trial court, we believe the trial court found that Mr. Garten effectively revoked his acceptance of the 1990 300E. Therefore, he was entitled to the remedies found under §§ 2–711 and –712 of the Commercial Law Article. Mr. Garten, after leaving the 1990 300E with Valley Motors for such a long period of time, was eventually forced to take some action. He could not be expected to continue renting cars and paying insurance on the 1990 300E while he waited for Valley Motors to respond to his demands. We believe Mr. Garten's retrieval of the car was reasonable under the circumstances and that he is entitled to the remedies contained in §§ 2–711 and –712.

 In examining the damages awarded by the trial court, we believe that the awards for the rental cars ($5060.05), reinstallation of the car phone and radar detector ($200.00), automobile insurance on the 1990 300E from May to December ($877.70), and the interest expenses ($3230.00) are reasonable incidental and consequential damages arising from Valley Motors' actions that are recoverable under §§ 2–711, –712 and 13–408. We are troubled, however, by the trial court's award of $11,750.00 for what it called, "The net cost differential." Therefore, we vacate and remand this aspect of the damages award to the trial court for further proceedings. On remand, the trial court should

consider the following factors: (1) Mr. Garten had use of the 1990 300E for one month; (2) Mr. Garten returned the car to Valley Motors with 1800 miles on it; (3) because Mr. Garten would have had to pay certain transportation expenses, if these problems had not arisen, he should not now be able to have *all* those expenses, for the time period in question, paid for by Valley Motors; (4) whether Mr. Garten's cover, the purchase of the 1991 300E, was reasonable; and, (5) whether $31,500 was a reasonable trade-in value for the 1990 300E.

### Attorney's Fees

Because we hold that the trial court erred in finding MBNA liable under Counts III and IV, the only Counts that allow for an award of attorney's fees, we need not consider MBNA's arguments on this issue.

■ Valley Motors challenges the trial court's award of attorney's fees based upon two arguments. First, Valley Motors claims that Mr. Garten failed to request attorney's fees under Count III, unfair or deceptive trade practices. Mr. Garten, however, is not required to include a request for attorney's fees in his complaint. Attorney's fees are considered a collateral matter and may be sought following final judgment on the underlying claim. *See Prince George's County v. Doe*, 300 Md. 445, 451 n. 4, 479 A.2d 352 (1984); *Larche v. Car Wholesalers, Inc.*, 80 Md.App. 322, 326–28, 562 A.2d 1305 (1989).

■ Second, Valley Motors contends that the amount of attorney's fees awarded by the trial court was erroneous because Mr. Garten only presented evidence on the total amount of time his attorney spent on the *entire* case and failed to present evidence on the amount of time allocated to the unfair and deceptive trade practices claim.[7]

There is no doubt that Mr. Garten may recover attorney's fees under § 13–408(b) of the CPA, but not for the breach

---

7. Because we hold that the trial court erred in finding appellants violated the Lemon Law, which also allows for recovery of attorney's

of an express warranty. Valley Motors, however, misconstrues this Court's decision in *Beery v. Md. Medical Lab., Inc.,* 89 Md.App. 81, 597 A.2d 516 (1991), *cert. denied,* 325 Md. 329, 600 A.2d 850 (1992). The *Beery* case dealt with an award of counsel fees pursuant to Md. Rule 1-341. This Court required the party seeking attorney's fees to present evidence showing the expenses actually incurred in defending the actual claim or claims brought in bad faith and/or without substantial justification. *Id.* at 102, 597 A.2d 516. We believe the facts in the *Beery* case limit its holding to Rule 1-341 actions and we are unwilling to extend its requirement of keeping detailed records into the consumer protection arena. We, therefore, hold that the trial court was not clearly erroneous in its award of attorney fees under § 13-408(b) of the CPA.

JUDGMENT REVERSED IN PART AND AFFIRMED IN PART; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID THREE-QUARTERS BY VALLEY MOTORS, INC., ONE-QUARTER BY APPELLEE.

fees, we limit our discussion to Valley Motors' challenges to the award under the unfair and deceptive trade practice provisions.